LANDAU, J.,
concurring.
This case presents the court with some very difficult issues involving not just the meaning of particular sections of the state constitution but also larger questions concerning the nature of constitutional interpretation itself and the role of stare decisis. In large part, it is a difficulty of the court’s own making. For decades, the court interpreted the constitution more or less on a case-by-case basis, resulting in lines of case law that, taken together, simply don’t make sense. For a time, the court attempted to move away from such incrementalism, adopting what purported to be a rigid originalist interpretive approach. See, e.g., Lakin v. Senco Products, Inc., 329 Or 62, 72, 987 P2d 463, modified, 329 Or 369, 987 P2d 476 (1999) (“[W]hatever the right to ‘Trial by Jury’ meant in 1857, it means precisely the same thing today.”). But as often as not, the effort was marred by historical analysis that did not withstand careful scrutiny and led to the adoption of rules that proved unworkable. In this case, the majority confronts those very problems with respect to the interpretation of two constitutional provisions—the jury trial guarantee of Article I, section 17, and the remedy provision of Article I, section 10.
In the case of Article I, section 17, the precedents have become irreconcilable, as the majority persuasively *255 demonstrates. That requires us to reevaluate, and the majority carefully and critically does just that, consistently with principles of constitutional interpretation that this court has settled on in recent years—principles that are less rigidly originalist and that require more careful historical analysis. I agree with the majority’s reevaluation and with its ultimate conclusion that Lakin must be overruled.
I also agree with the majority’s analysis of Article I, section 10, at least in part. Like Lakin, Smothers v. Gresham Transport, Inc., 332 Or 83, 23 P3d 333 (2001), must be overruled. I have long argued that Smothers was incorrectly decided—not just incorrect in the sense that reasonable people could disagree about its analysis and holding, but incorrect in the sense that its analysis is demonstrably at odds with the very sources on which it relies. See generally Klutschkowski v. PeaceHealth, 354 Or 150, 178-96, 311 P3d 461 (2013) (Landau, J., concurring); Brewer v. Dept. of Fish and Wildlife, 167 Or App 173, 191-98, 2 P3d 418 (2000) (Landau, J., concurring).
In my view, however, the majority didn’t go far enough. The problems with this court’s remedy clause jurisprudence fun far deeper than one errant decision. Smothers was but the latest in a long line of remedy clause decisions that—for over a century—have veered in one direction, then another, then another still, resulting in a jurisprudence that this court itself has complained lacks anything resembling doctrinal coherence.
In my view, the majority should not have stopped with overruling Smothers. Instead, it should have subjected the entire line of remedy clause decisions to the same searching and critical analysis to which it subjected our cases construing the jury guarantee. That sort of critical analysis of the remedy provision of Article I, section 10, shows that it is debatable whether the framers of the Oregon Constitution intended or understood Article I, section 10, to operate as a limitation on legislative authority at all. At best, the wording of the constitution and the historical circumstances surrounding its adoption fairly may be read to support a general principle that the remedy provision precludes legislative interference with judicial independence and access to *256 the courts, but not that it limits the legislature’s authority to determine substantive rights and remedies, as many of this court’s prior cases declare. I would overrule those cases. It is for that reason that I conclude that the trial court in this case erred in holding that the legislature’s statutory cap on damages violates Article I, section 10, and therefore concur in the result that the majority reaches.
I. STARE DECISIS AND THE APPROPRIATE STANDARD OF REVIEW
At the outset, I acknowledge the importance of stare decisis. It goes without saying that stability and predictability are essential to the consistent administration of justice and the legitimacy of this court’s decisions. But stubborn adherence to precedent that is demonstrably in error is not without cost. Correctness is also important to the administration of justice and this court’s legitimacy, particularly in the case of constitutional interpretation. Couey v. Atkins, 357 Or 460, 485, 355 P3d 866 (2015) (“Especially in cases involving the interpretation of the state constitution, the value of stability that is served by adhering to precedent may be outweighed by the need to correct past errors.”). When this court examines a line of carefully considered and consistent precedents, I agree that the burden on anyone challenging them is a heavy one and that we should adhere to those precedents unless they are clearly incorrect. Id. at 485-86. When the existing case law is hopelessly inconsistent, however, there is no such burden. In such cases, in order to make sense of the law, something will have to be jettisoned. No particular burden applies. Id.
In the case of Article I, section 10, the case law is hardly consistent. As then-professor David Schuman commented, “the remedy clause has not occasioned a coherent body of case law leading to anything that could be called an ‘interpretation.’” David Schuman, Oregon’s Remedy Guarantee: Article I, Section 10 of the Oregon Constitution, 65 Or L Rev 35, 36 (1986). That is also the court’s own assessment of its precedents. Neher v. Chartier, 319 Or 417, 423, 879 P2d 156 (1994) (“This court’s case law throughout the nineteenth and twentieth centuries interpreting Article I, section 10, * * * has failed definitively to establish *257 and consistently to apply any one theory regarding the protections afforded by the remedies guarantee.”)- Indeed, Smothers itself observed that “this court has not developed a consistent body of law interpreting the remedy clause of Article I, section 10.” 332 Or at 90.[1]
About that much, Smothers was correct. For example, in some cases, the court has rejected out of hand the notion that Article I, section 10, constrains the legislature at all. Templeton v. Linn County, 22 Or 313 (1892), illustrates the point. At common law, a county was not liable for injury resulting from a defect in one of its roads. But the territorial legislature recognized such a right by statute, at least for a time. Some years later, the Oregon legislature repealed that statute. Templeton, who was injured as a result of an alleged defect in a Linn County road, argued that the repeal of the statute violated the remedy guarantee of Article I, section 10. The court rejected the argument. Chief Justice Strahan explained that the plaintiffs argument appeared to be that, once the legislature has granted a remedy, the constitution “tied the hands of the legislature so that such liability should endure as long as the constitution shall remain in force. As a proposition of constitutional law,” he observed, “this contention seems startling.” Id. at 316. “[N]o judicial authority was cited upon the argument in support of it,” the Chief Justice wrote, “and I think it may be safely assumed that none exists.” Id.[2]
*258 In contrast, in Mattson v. Astoria, 39 Or 577, 580, 65 P 1066 (1901), the court took an entirely different view of Article I, section 10, holding instead that its remedy provision was “intended to preserve the common-law right of action for injury to person or property.” There was no mention of the directly contrary view taken by the court in Templeton. Then in Thieler v. Tillamook County, 75 Or 214, 217, 146 P 828 (1915), the court followed Mattson, expressly adopting the view of Article I, section 10, that earlier had been set out by Federal District Court Judge Matthew Deady in Eastman v. County of Clackamas, 32 F 24 (D Or 1887). In that case, Deady suggested that, under Article I, section 10, “[w]hatever injury the law, as it then stood [at the time the constitution was adopted], took cognizance of and furnished a remedy for, every man shall continue to have remedy for by due course of law.” Id. at 32. This time, at least, the court mentioned Templeton, but it said that a “vigorous dissenting opinion” in that case had deprived the court’s opinion of its “binding force”—an interesting view of the authority of dissenting opinions, to be sure. Theiler, 75 Or at 217-18. Any doubts that the court had adopted Deady’s views of the remedy provision in Eastman were put to rest in Stewart v. Houk, et al., 127 Or 589, 593, 271 P 998 (1928), in which the court preceded a lengthy quote from Eastman with the assertion that the quoted material “was adopted” in Theiler. See also West v. Jaloff, 113 Or 184, 195, 232 P 642 (1925) (“[I]t has been the settled law of this state that the common-law remedy for negligently inflicted injuries could not be taken away without providing some other efficient remedy in its place.”).
But then in Perozzi v. Ganiere, 149 Or 330, 345, 40 P2d 1009 (1935), the court altered course, upholding the constitutionality of Oregon’s guest passenger statute and rejecting the plaintiffs contention that “in all instances in which recovery could be had at common law for injuries to person or property such right of recovery has, by [A]rticle I, [section] 10, been preserved, and that it is not within the province of the legislature to take it away or in any way limit it.” The court commented that, “had it been the intention of *259 the framers of the constitution to adopt and preserve the remedy for all injuries to person or property which the common law afforded, they undoubtedly would have signified that intention by exact and specific wording, rather than the language used in [A]rticle I, [section] 10.” Id. at 346.
In Noonan v. City of Portland, 161 Or 213, 88 P2d 808 (1939), the court took a similar position, holding that the constitution “does not forbid the creation of new rights, or the abolition of old ones recognized by the common law, to attain a permissible legislative object.” Id. at 249 (quoting Silver v. Silver, 280 US 117, 121, 50 S Ct 57, 74 L Ed 221 (1929)). The court noted that, notwithstanding the constitutional remedy guarantee, it had countenanced the elimination of whole claims, such as alienation of affection and actions for breach of promise. Id. Interestingly, the court went out of its way to disavow Deady’s altogether different reading of the remedy clause in Eastman, commenting that—contrary to Stewart—such views “do not represent the construction of this court.” Id. In a similar vein, Sealey v. Hicks, 309 Or 387, 788 P2d 435 (1990), asserted that “[t]he legislature has the authority to determine what constitutes a legally cognizable injury” without running afoul of Article I, section 10.
Smothers recognized the unsettled state of this court’s prior remedy clause jurisprudence and attempted to resolve, once and for all, the proper interpretation of the clause. 332 Or at 90-91. It overruled (among other cases) Perozzi and Sealey, resuscitated Eastman and the cases relying on it, and concluded that the remedy clause constrained the legislature from unduly altering common-law rights. Smothers, 332 Or at 119, 123-24.
Unfortunately, the court failed in its effort to bring clarity to the law. Indeed, in the years since Smothers, this court has had difficulty even agreeing on what the decision means, as this court’s sharply-divided post-Smothers case law makes clear. See, e.g., Howell v. Boyle, 353 Or 359, 298 P3d 1 (2013); Lawson v. Hoke, 339 Or 253, 119 P3d 210 (2005).[3]
*260 So, in a nutshell, this court started out in Templeton by saying that Article I, section 10, imposes no limits on legislative authority; then it abandoned Templeton in Mattson and Thieler, adopting instead the views of Deady that the provision preserved common-law rights that existed at the state’s founding; but then it disavowed Deady, along with Mattson and Thieler, in Perozzi and Noonan', only to have those very cases revived, and Perozzi and Noonan disavowed, in Smothers', which we now overrule, thereby reviving Perozzi and Noonan. It’s no small wonder to me that this court’s remedy clause jurisprudence has been the subject of derision. In my view, there exists no body of Oregon case law that uniformly views the meaning and application of the remedy clause of Article I, section 10, and that we must now determine was clearly incorrect. As I see it, there is only a constantly shifting series of cases on the clause that cannot be reconciled among themselves, leaving us to decide which, if any, are correct.
II. ANALYSIS OF ARTICLE I, SECTION 10
I turn, then, to the proper analysis of Article I, section 10, examining the text of the provision, in its historical context, and in light of relevant case law. Priest v. Pearce, 314 Or 411, 415-16, 840 P2d 65 (1992). I hasten to add that, in engaging in that examination, I don’t believe that the meaning of the Oregon Constitution is limited to whatever its framers would have understood at the time of its adoption. As I have noted elsewhere, I think that that brand of originalism is unwise and untenable and all too often—as in Lakin and Smothers—results in reliance on interpretations of historical source materials that are both unduly selective and anachronistic. See, e.g., State v. Hemenway, 353 Or 129, 156-57, 295 P3d 617 (2013) (Landau, J., concurring), vac’d by State v. Hemenway, 353 Or 498, 302 P3d 413 (2013) (so noting).
But that doesn’t mean that the constitution is simply a blank canvas on which we may paint our personal *261 preferences. If our constitutional doctrine is to retain legitimacy as constitutional “interpretation,” it still must comport witli the reasonable construction of the text; why else, it might be asked, do we have a written constitution?[4] Moreover, although the meaning of our constitution may not be frozen in the mid-nineteenth century, it remains a 150-year-old historical document, which must be viewed in its historical context. As we explained in State v. Mills, 354 Or 350, 354, 312 P3d 515 (2013), the purpose of examining the historical context of a provision is not “to fossilize the meaning of the state constitution so that it signifies no more than what it would have been understood to signify when adopted in the mid-nineteenth century.” It is instead to determine the general principles that animate it and that may be applied to modern circumstances. State v. Davis, 350 Or 440, 446, 256 P3d 1075 (2011). History may not be controlling, but it is never irrelevant. In my view, adherence to those fundamental principles of constitutional interpretation precludes perpetuating the erroneous conclusion of Smothers and its predecessors that Article I, section 10, constitutionally guarantees a right to assert particular tort claims without legislative qualification or modification.
A. Text
Article I, section 10, provides:
“No court shall be secret, but justice shall be administered, openly and without purchase, completely and without delay, and every man shall have remedy by due course of law for injury done him in his person, property or reputation.”
I quote the entire section because it is important to emphasize that what we often refer to as the “remedy clause” of Article I, section 10, actually is but a part of a larger, *262 single, complete sentence. Taken as a whole, the subject of that sentence is fairly clear to me: It is about the courts, the authority of the courts, and the obligations of the courts.[5] As then-professor Hans Linde observed of the clause, “ [s] ection 10 as a whole is plainly concerned with the administration of justice.” Hans A. Linde, Without “Due Process”: Unconstitutional Law in Oregon, 49 Or L Rev 125, 136 (1970). Nothing in the wording of the section suggests that its purpose is to constrain the otherwise plenary authority of the legislature. MacPherson v. DAS, 340 Or 117, 127, 130 P3d 308 (2006) (quoting Jory v. Martin, 153 Or 278, 286, 56 P2d 1098 (1936) (‘“Plenary power in the legislature, for all purposes of civil government, is the rule, and a prohibition to exercise a particular power is an exception.’”)).
That does not necessarily mean that Article I, section 10, cannot be read to constrain the legislature in any way. To the extent that the legislature were to enact a statute that interfered with the constitutional obligations of the courts— requiring the courts to operate in secret, for example— such legislation could violate the remedy clause. See, e.g., State ex rel. Oregonian Pub. Co. v. Deiz, 289 Or 277, 284, 613 P2d 23 (1980) (notwithstanding statute authorizing trial court to exclude public from juvenile cases, trial court order barring public violated Article I, section 10). The point remains, however, that the focus of the section is a procedural one, involving access to the courts, which are to administer justice to every person, openly, freely, completely, by due course of law.
I acknowledge that what I have described is not the only plausible way to read the text of Article I, section 10. The section’s single sentence could be divided into three independent clauses, each of which could then be interpreted separately. Thus, the first two clauses could be seen as procedural in nature, concerning the administration *263 of justice, while the third clause could be interpreted to signify a guarantee of a remedy for the specified types of injuries.
But the issue to me is not whether Article I, section 10, may be plausibly interpreted one way or another. As I said at the outset, I do not start from the assumption that this court’s existing case law represents a coherent view of the remedy clause, which we must uphold so long as it is reasonable. The case law represents no such coherent view, and so I look at the provision afresh, to determine what it most likely was intended or understood to mean.
With that in mind, it strikes me that reading the remedy clause as an independent clause is not the most likely reading of Article I, section 10. It requires us to extract the clause from the balance of the sentence and ignore its immediate and indispensible context. Cf. Vsetecka v. Safeway Stores, Inc., 337 Or 502, 508, 98 P3d 1116 (2004) (“Viewed in isolation, that text provides support for employer’s position. Ordinarily, however, text should not be read in isolation but must be considered in context.”). Moreover, I am not persuaded that reading the remedy clause in isolation is altogether faithful to the wording of that independent clause. Taking the clause as a whole, it seems to me that it guarantees “every” person a remedy “by due course of law.” As David Schuman put it, the remedy clause of Article I, section 10, “guarantees that for injuries of a certain type, a person shall have access to a remedy through the state’s legal apparatus.” David Schuman, The Right to a Remedy, 64 Temple L Rev 1197 1201-02 (1992) (emphasis in original). Indeed, it occurs to me that reading the clause to impose a guarantee of particular substantive rights and remedies doesn’t leave anything for the phrase “by due course of law” to do. I would think that we would be constrained to avoid interpretations that entail such superfluities.
B. Historical context
Assuming for the sake of argument the plausibility of reading the text of Article I, section 10, to express a substantive limitation on legislative authority to determine rights and remedies, the fact remains that the alternative reading that I have suggested is at least plausible *264 as well. That leads to an examination of the historical context in which that possibly ambiguous wording was adopted.
I set out my views about the historical roots of modern remedy provisions in Klutschkowski and in Brewer, and I won’t reprise them in detail here. In brief, the genesis of modern remedy provisions lies in English concerns about royal interference with the courts, first given expression in Lord Edward Coke’s writings about Magna Carta and later voiced in William Blackstone’s Commentaries on the Laws of England. Klutschkowski, 354 Or at 180-84; Brewer, 167 Or App at 195-97. Early American state constitutions adopted remedy guarantees patterned after those English sources, with a notable absence of explanation that the guarantees were intended to accomplish something else, such as establish a limitation on legislative authority to determine substantive rights and remedies. Klutschkowski, 354 Or at 185-86. While those early state constitutions reflected some mistrust of legislative power, that mistrust focused on corruption in the legislative process and lack of deliberation in the passage of laws, not the abrogation of common-law remedies. Id.
The majority in this case acknowledges that history, but suggests that it is at least possible that the framers of the Oregon Constitution could have had a different understanding of the meaning and effect of Article I, section 10, because of some ambiguities in the writings of Coke and Blackstone and because of the holdings of a number of state courts interpreting state constitutional remedy guarantees in the early to mid-nineteenth century. 359 Or at 205, 208.
I have a different view of those historical sources and their significance. In large part, that is because I frame the issue differently from the majority. Again, the question for me is not what the historical sources might plausibly be said to signify; rather it is what they, in fact, show that the framers of the state constitution most likely would have understood or intended Article I, section 10, to mean. With that in mind, I turn to Coke, then to Blackstone, and finally to the nineteenth-century American case law.
*265 The focus of Coke’s writing on Chapter 29 of Magna Carta[6] was the protection of the common-law courts from royal and preferential interference, and the oft-quoted provision that was the textual basis for modern remedy guarantees makes that clear:
“And therefore, every subject of this realme, for injury done to him, in bonis, torres, vel persona, by any other subject, be he ecclesiastical, or temporall, free, or bond, man, or woman, old, or young, or be he outlawed, excommunicated, or any other without exception, may take his remedy by the course of the law, and have justice, and right for the injury done to him, freely without sale, fully without any denial!, and speedily without delay.”
Edward Coke, The Second Part of the Institutes of the Laws of England 55 (1797 ed.). Read in context, it becomes abundantly clear that Coke’s point is that every subject has access to the justice of the courts, regardless of age, gender, or station in life. The passage says nothing about limitations on legislative authority to revise the common law. To the contrary, “Coke clearly acknowledges that statutes can correct the common law and thus that they take precedence over the common law that they revise.” James R. Stoner, Jr., Common Law and Liberal Theory: Coke, Hobbes, and the Origins of American Constitutionalism 22 (1992).
Coke did author Dr. Bonham’s Case, in which he said, in dictum, that when acts of Parliament are “against common right and reason, or repugnant, or impossible to be performed, the common law will controul it, and adjudge such Act to be void.” 77 Eng Rep 646, 652 (CP 1610). That dictum has been read by some to suggest a sort of progenitor to modern conceptions of judicial review, although the view is controversial, and modern scholarship tends to regard the case as standing for a more limited proposition that acts of Parliament were to be construed to avoid conflicts with the *266 common law.[7] While interesting, the dictum in Dr. Bonham’s Case is a bit of a red herring concerning the origin and meaning of state constitutional remedy guarantees. For even assuming that Coke meant to suggest that there may be some limits on parliamentary authority, nothing in the decision connects it with Magna Carta and the idea that Chapter 29 limited the authority of Parliament to determine substantive rights and remedies. Moreover, whatever Coke may have been up to in Dr. Bonham’s Case, the notion that Parliament was subject to the common law gave way to a much more vigorous doctrine of parliamentary supremacy by the time of Blackstone.
Blackstone, like Coke, viewed Chapter 29 of Magna Carta as having been directed at royal interference with judges and courts. In his view, Magna Carta forbade the crown from issuing “commands or letters” to the courts either “in disturbance of the law” or “to disturb or delay common right.” William Blackstone, 1 Commentaries on the Laws of England 138 (1st ed 1765). Nothing in the Commentaries suggests that Blackstone thought that Magna Carta limited the authority of Parliament to determine substantive rights *267 and remedies. To the contrary Blackstone, even more than Coke, believed in parliamentary supremacy.[8] In Blackstone’s view, “[t]he power and jurisdiction of Parliament *** is so transcendent and absolute that it cannot be confined, either for causes or persons, within any bounds.” Id. at 156. He took the position that “the legislature being in truth the sovereign power,” it is “always of absolute authority; it acknowledges no superior on earth.” Id. at 90. That sovereign and absolute power, Blackstone explained, included the authority to enlarge “the common law where it was too narrow and circumscribed” and to “restrain [] it where it was too lax and luxuriant.” Id. at 86-87. In cases of conflict between the common law and parliamentary legislation, Blackstone said, “the common law gives place to the statute.” Id. at 89.
To be sure, Blackstone also sprinkled his Commentaries with suggestions that the law—both common law and legislation—should reflect reason. Id. at 70. He went so far as to say that “what is not reason is not law” and that acts of Parliament contrary to reason or leading to absurd results would be “void.” Id. at 70.
But to read in those suggestions some broader notion that Blackstone recognized limits to legislative authority would be a mistake. Blackstone himself explained that, although certain acts of Parliament may in some sense be “void” because they offend natural law or reason, the courts lack power to do anything about it. “[T] hough I know it is generally laid down more largely, that acts of parliament contrary to reason are void,” he said, “if the parliament will positively enact a thing to be done which is unreasonable, I know of no power to control it.” Id. at 91. Blackstone explicitly *268 rejected the idea that judges are at liberty to invalidate acts of Parliament, which he said “would be subversive of all government.” Id.[9]
Thus, I find no support in Blackstone’s Commentaries for the suggestion that when Magna Carta (as Coke reimag-ined it) guaranteed access to courts free of royal interference, it also guaranteed access to some irreducible quantum of common-law remedies. Such a suggestion runs directly counter to Blackstone’s views about the supremacy of parliamentary authority. He said that the law of the land “is permanent, fixed and unchangeable, unless by the authority of parliament.” Id. at 137 (emphasis added). According to Blackstone, “[Parliament] being the highest and greatest court, over which none other can have jurisdiction in the kingdom, if by any means a misgovernment should any way fall upon it, the subjects of this kingdom are left without all manner of remedy” Id. at 157 (emphasis added).[10]
Finally, there is the body of early to mid-nineteenth-century American appellate court decisions that interpreted, discussed, or referred to state constitutional remedy guarantees. There were a number of such decisions, and they reflected something of a spectrum of views about remedy guarantees. Some concluded that the remedy clauses applied as constraints on the courts alone, not legislatures. *269 Others adopted the view that remedy guarantees foreclosed legislation that interfered with ongoing court procedures and proceedings. Still others concluded that remedy provisions prohibited legislatures from retroactively altering vested rights, which was viewed as a violation of separation of powers principles. Finally, some invoked remedy guarantees as grounds for giving statutes narrow interpretation and application.
It is significant to me that none of those early to mid-nineteenth-century cases held that state remedy guarantees limited the authority of state legislatures to define, prospectively, the nature of substantive rights and remedies. In fact, the idea that state constitutional remedy guarantees impose such a substantive limit on the authority of state legislatures did not emerge until relatively late in the nineteenth century. See generally Thomas R. Phillips, The Constitutional Right to a Remedy, 78 NYU L Rev 1309,1329 (2003) (“Not until well after the Civil War was there any reported opinion dealing with a remedies clause challenge to a statute limiting a tort claim.”). And the first appellate court decision to actually strike down such a statute on remedy clause grounds was this court’s decision in Mattson, published in 1901. Id. at 1330.
The first category of early to mid-nineteenth-century remedy clause cases that I mentioned consists of those viewing the clause as limiting the authority of the courts alone, not legislatures. In Barkley v. Glover, 61 Ky 44, 45 (1862), for example, the Kentucky Court of Appeals expressly rebuffed the suggestion that the state’s remedy clause constrained the state legislature at all, explaining, “The doctrine that the [remedy guarantee] applies alike to the legislative and judicial branches is, in our judgment, directly opposed to the meaning and language of the section.” In that court’s view, “[t]he courts form its sole subject matter, and every part and parcel of the section relates directly to some duty of that branch of the government.” Id. at 46. Certainly, such a limited view of the remedy guarantee is consistent with its English antecedents in the writings of Coke and Blackstone.
The second category that I mentioned includes cases in which courts invoked state remedy guarantees *270 to forbid legislative interference with judicial administration. In Weller v. City of St. Paul, 5 Minn 95, 101 (1860), for instance, the court held that access to courts cannot be limited by a requirement of payment of certain fees in advance. Similarly, in Menges v. Dentler, 33 Pa 495, 498 (1859), the court explained that remedy guarantees prevented “legislative and executive interference” with judicial proceedings. See also Sharpless v. Mayor of Philadelphia, 21 Pa 147, 166 (1853) (remedy clause was “clearly intended to insure the constant and regular administration of justice”). In a related vein, in Lewis v. Webh, 3 Me 326, 335 (1825), the court held that legislation purporting to vacate an existing judgment or decree violates the state constitutional remedy guarantee. Although the views of state remedy guarantees expressed in such cases expand the reach of the clauses to include limitations on legislative authority, they align quite well with the historical roots of such clauses in fears of interference with the independent exercise of the judicial function.
The third category of cases is perhaps the largest and comprises decisions proscribing retroactive abrogation of “vested rights.” Especially important in understanding the significance of those cases is the fact that they barred only retroactive alteration of such rights. Indeed, a number of the decisions went out of their way to emphasize the authority of legislatures to adjust, modify, or eliminate remedies for specified injuries as long as they did so on a prospective basis.
Gooch v. Stephenson, 13 Me 371 (1836), serves as a good illustration. At issue in that case was the constitutionality of a legislative grant of immunity against trespass claims based on cattle wandering on to property that was inadequately fenced. The plaintiff had argued that the grant of statutory immunity ran afoul of the state’s constitutional remedy guaranty. The Supreme Judicial Court of Maine rejected the argument, explaining that
“It was for the legislature to determine what protection should be thrown around this species of property; what vigilance and what safeguards should be required at the hands of the owner; and where he might invoke the aid of courts of justice. They have no power to take away vested *271 rights; but they may regulate their enjoyment. Lands in this country cannot be profitably cultivated, if at all, without good and sufficient fences. To encourage their erection, it is undoubtedly competent for the legislature to give to the owners of lands thus secured, additional remedies and immunities.”
Id. at 376-77; see also Preston v. Drew, 33 Me 558, 560 (1852) (“[t]he State, by its legislative enactments, operating prospectively, may determine that articles injurious to the public health or morals, shall not constitute property” subject to remedy, without violating remedy guarantee).
Fisher’s Negroes v. Dabbs, 14 Tenn 119 (1834), provides another excellent example. The Tennessee Supreme Court’s opinion may well be the most extensive antebellum state court analysis of constitutional remedy guarantees. In that case, an act of 1829 provided that, when a slave owner freed slaves by will but the testator refused to file a bill in the county court to act on that devise, the slaves, “by their next friend,” could file a bill to obtain legal recognition of their emancipation. When one Fisher died, his will directed that his slaves be freed and given the right to live on his land for the next 15 years. The executor of the will refused to recognize the devise and declined to file a bill in county court to obtain the emancipation of Fisher’s slaves. Pursuant to the 1829 statute, an action was filed on behalf of Fisher’s slaves to obtain their emancipation. While the action was pending, the Tennessee legislature repealed the earlier statute in 1831 and directed that any pending cases under it be dismissed. The chancellor ruled that the 1831 statute could not divest Fisher’s former slaves of their claims, which were pending at the time of passage, based on the state’s constitutional remedy guarantee:
“This declaration, copied from the great charter, is not a collection of unmeaning epithets. In England, the reason of riveting this barrier around the rights of the subject was well understood. Their sovereign was wont to interfere in the administration of justice; ‘a remedy by due course of law’ was often refused, under the mandate of men in power, and the injured man denied justice; they were ordered sometimes not to proceed with particular causes, and justice was delayed; and the obtainment of their rights was *272 often burdened with improper conditions and sacrifices, and justice was sold. *** [T]he framers of our constitution decreed, that the judicial department should be independent and coordinate, and that the legislature should have no judicial power.
"*****
“A distinction between the right and the remedy is made and exists. But where the remedy has attached itself to the right, and is being prosecuted by ‘due course of law,’ to separate between them, and take away the remedy, is to do violence to the right, and comes within the reason of that provision of our constitution which prohibits retrospective, or, in other words, retroactive, laws from being passed, or laws impairing the obligation of contracts.
“By the act of 1829, all slaves in whose favor there is a devise of liberty, and where the representative of the testator refuses to apply to the county court, they may file a bill, by their next friend, in this court. The act of 1831 attempts to take away this right from a portion of them, and from that portion of them where the right and remedy had attached by the actual pendency of a suit in a ‘due course of law.’”
Id. at 137-38. The executor appealed, but the Supreme Court of Errors and Appeals affirmed, adopting the opinion of the chancellor, explaining that,
“He who has a lawful right, and a legal remedy to enforce that right, and the jurisdiction of a court has attached upon it, is entitled to judgment. The legislature has no power to close the courts. The courts shall be open, and every man shall have remedy by due course of law.”
Id. at 159.
A further example is provided by Barclay v. Weaver, 19 Pa 396 (1852), in which the court addressed the applicability of a statute that purported to alter, retroactively to existing contracts already in force, the notice requirements for enforcing contracts. The Pennsylvania Supreme Court construed the statute as not having immediate effect on existing contracts to avoid a conflict with the state remedy guarantee. Id. at 399. The court explained that it could not give the statute immediate effect “without at all affecting or *273 altering contracts already made, and a regard for the constitution requires us to presume that no other effect was intended.” Id. A few years later, in In re Stuber’s Road, 28 Pa 199 (1857), the same court went even further and held that legislation vacating interests in land that had previously been acquired by prescription did not violate the state constitutional remedy provision, explaining that the constitution “furnish [es] no guaranty that the law of the land and the due course of law shall remain unalterable.” Id. at 201.
The Mississippi Supreme Court invoked similar reasoning in Commercial Bank of Natchez v. Chambers, 16 Miss 9 (1847), in which the legislature purported to amend an earlier statute governing actions against corporations for forfeiture of their charters. The court concluded that the statute violated the state constitutional remedy guarantee because “[i]t takes away from [the parties] a suit pending, which is made a matter of right.” Id. at 29.
I suppose it may plausibly be asserted that those cases could be read to stand for the proposition that early to mid-nineteenth-century courts—or at least a good number of them—saw state constitutional remedy guarantees in broader terms than their English roots would otherwise have suggested. Once again, though, I don’t see the task in those terms. The question isn’t whether those cases might plausibly be read to support a broader rendition of the remedy guarantee. The question for me is what, in fact, did the framers of Oregon’s constitution most likely understand them to mean.
The answer to that question is that it is highly unlikely that the framers of Article I, section 10, would have understood those decisions as having significantly broadened the effect of state constitutional remedy guarantees to impinge on the authority of legislatures to make policy decisions about the nature of rights and remedies for injuries to person, property and reputation. That is because there was a well-established reason for early to mid-nineteenth-century courts’ antipathy to retroactive legislation—a reason that lines up perfectly with what I have described is suggested by the text of Article I, section 10, and its historical context.
*274 In brief, retroactive legislation that infringed on vested rights was seen as violating antebellum conceptions of the separation of legislative and judicial powers. As the Illinois Supreme Court explained in Newland, v. Marsh, 19 Ill 376, 383 (1857), a vested right may not be eliminated “except by judgment of law; and the legislature, having no judicial power, cannot impart to their enactments the force of a judicial determination.”[11]
Although it may ring oddly to our twenty-first-century ears, early conceptions of the separation of powers *275 assumed that judicial decisions applied retrospectively, while legislation was held to apply prospectively.[12] In that era, rights were understood to be governed by the law in effect at the time they vested. See, e.g., Chapman & McConnell, Due Process as Separation of Powers, 121 Yale LJ at 1737-38 (According to nineteenth-century views, vested rights “had been conclusively acquired pursuant to the positive law in effect at the time of acquisition.”).[13] In consequence, any disputes about those rights necessarily were subject to resolution by the courts in accordance with that law. Any attempt by a legislature to alter the law that the courts otherwise would have been required to apply at the time of vesting was regarded as a usurpation of the judicial function. As an early nineteenth-century authority explained, legislation retroactively altering vested rights amounted to
“a gross usurpation in most cases upon the judicial power. Now what is the nature, and what the object of all retrospective laws? In the first place, they do not look to the future; their operation is upon the past, and in this aspect they directly invade the appropriate domain of the judicial power.”
*276 Simeon Nash, The Constitutionality of Retrospective Statutes, 2 WLJ 170, 174 (1844-45) (emphasis omitted). The author explicitly referred to the state constitutional remedy guarantee, noting that its purpose was to ensure that vested rights were to be determined “by the court and not by the legislature.” Id.
In that context, there is nothing at all unusual about early to mid-nineteenth-century court decisions declaring that retroactive legislation impairing vested rights violated state remedy guarantees. The underlying rationale for such decisions was that legislation of that sort interfered with the independence of the judiciary, which as I have noted, was precisely the historical underpinning of the remedy guarantees in the first place.[14]
The fourth and last category of early to mid-nineteenth-century remedy clause precedents involves those in which the courts invoked remedy guarantees as a reason to impose a narrowing construction on a statute at issue. For example, in Thornton v. Turner, 11 Minn 336, 339 (1866), the court expressed “doubt” about the constitutionality of giving a broad interpretation to a statute limiting actions for damages arising out of the erection of a mill dam to avoid possible constitutional problems. Likewise, in Hotchkiss v. Porter, 30 Conn 414, 421 (1862), the court commented that a more limited construction of a statute limiting recovery for libel avoided constitutional difficulties. And in Schuylkill Nav. Co. v. Loose, 19 Pa 15, 18 (1852), the court similarly construed a statute narrowly and mentioned in the process the state constitutional remedy guarantee.
*277 It may be argued that those courts, in so doing, appear to have assumed that giving the statutes at issue a broader interpretation would run afoul of the state remedy guarantee, thus supporting the inference that at least some courts thought that those constitutional provisions limited legislative authority to determine rights and remedies.
Once again, though, that frames the issue in a different way than I think this case warrants. For me the question is not whether a plausible argument can be made that the cases would have been understood to reflect a broader understanding of remedy guarantees; rather it is whether, in fact, it is likely that they would have been so understood. I don’t think so.
To begin with, that a court elects to give a statute a narrow construction to avoid possible constitutional issues does not necessarily mean that the court is, in the process, actually deciding what the constitution means. Under the statutory construction conventions of the era, courts sometimes gave a narrowing construction to a statute merely to avoid potential constitutional problems. See, e.g., John Copeland Nagle, Delaware & Hudson Revisted, 72 Notre Dame L Rev 1495, 1509 (1997) (Examining nineteenth-century cases in which courts concluded that “[t]he existence of constitutional doubts provided a sufficient basis for rejecting an argument that a statute was unconstitutional. Statutes were presumed constitutional—often to the point that courts demanded that the unconstitutionality of a statute be proved ‘beyond a reasonable doubt.’ Therefore, if a court determined that an interpretation of a statute simply raised doubts about its constitutionality, the court abided by that interpretation and rejected the constitutional challenge.”).
Moreover, the inference that the courts in those cases implicitly held that remedy guarantees imposed a broad limitations on the authority of the legislature to eliminate tort remedies is unlikely in light of the fact that the same courts, in other cases, held more explicitly to the contrary when actually deciding the meaning of the remedy guarantees. In Schuylkill Nav. Co., for example, the Pennsylvania Supreme Court cited the state’s remedy clause in narrowly construing a statute. Ten years earlier, though, *278 the same court held that “it is now clearly established by repeated decisions, that the legislature may pass laws altering, modifying or even taking away remedies for the recovery of debts,” without violating various constitutional provisions that otherwise limit legislative authority. Evans v. Montgomery, 4 Watts & Serg 218, 220 (Pa 1842). According to the court, “where the provisions of such laws, in relation to remedies, apply only to future proceedings, there is not the least ground for appealing to constitutional restrictions on the powers of the legislature.” Id. And, consistently with that holding, the Pennsylvania Supreme Court held in Barclay and Stuber’s Road that the remedy guarantees precluded retroactive alteration of vested rights. In my view then, it is a bit of a stretch to say that early to mid-nineteenth-century cases giving more limited interpretations to statutes suggest a broader view of remedy guarantees. As I have stated earlier, the fact is that it was not until the early twentieth century that appellate court decisions went that far.
In short, none of the four categories of early to mid-nineteenth-century remedy clause cases supports the notion that the clause was understood or intended to serve as a limitation on legislative authority to determine rights and remedies for injuries to persons, property, or reputation. At best, they suggest that the clause could have been understood to limit legislative authority to interfere with the administration of justice and to alter retroactively vested rights, which would have been seen as an encroachment upon judicial independence.
Interestingly, Oregon territorial case law is consistent with that understanding of early to mid-nineteenth-century law. In McLaughlin v. Hoover, 1 Or 32 (1853), for example, the Territorial Supreme Court addressed the operation of a statute of limitations. The court noted that, “it is the duty of the court to apply the remedy by limitation in all cases, except where it would cut off the right” that has already vested, in which case the court “is bound, by fundamental law, to give a party reasonable time in which to escape the effect of such remedy.” Id. at 35; see also Steamer Gazelle v. Lake, 1 Or 119, 121 (1854) (“It is competent for the legislature, at any time, to alter or change the remedy *279 or mode of enforcing a right, and all proceedings instituted thereafter must conform to the new remedy.”).
It was in that context that the framers of the Oregon Constitution adopted not only Article I, section 10, but also Article XVIII, section 7, which provides that, “[a] 11 laws in force in the Territory of Oregon when this Constitution takes effect, and consistent therewith, shall continue in force until altered or repealed.” (Emphasis added.) It was thus expressly contemplated that the legislature would have the authority to alter or repeal common-law remedies. In the context of the Oregon territorial-era case law, along with the early-nineteenth-century decisions from other jurisdictions, it seems fairly clear to me that the framers, at best, would have understood that the legislature’s authority to do that might be limited to adopting such changes prospectively. But I find a complete absence of evidence to support the idea that the framers would have understood the legislature to be further constrained by a requirement that there be “adequate” justification of “public importance” or some other limitation on its substantive authority.
C. Significance of the historical context
It remains for me to determine the significance of the historical context. After all, I did say that we are not strictly limited by the meaning of a constitutional provision that would have been generally accepted in 1857. But I also said that, as our precedents correctly require, we cannot simply ignore the historical context. Whatever construction we adopt must be faithful both to the text and the general purposes reflected by the context in which that text was adopted.
In this case, the text reflects no particular purpose in limiting the substantive authority of the Oregon legislature. Rather, it speaks to the courts (“No court shall . . .”) about the authority of the courts and the responsibilities of the courts—to ensure that justice is administered openly, speedily, affording every person remedy by due course of law.
The historical roots of the wording of remedy guarantees lay in concern with executive interference with the *280 courts. From Coke to Blackstone and into the early years of the republic, the basic idea was that courts must be free to administer justice to all, without interference from the executive. I find little, if any, historical support for a broader notion that remedy guarantees might also have been designed to curb legislative excesses. As I have explained, that notion is an anachronism, contrary to the sort of notions of legislative supremacy that prevailed at the time.
Although, strictly speaking, state remedy guarantees are rooted in concern about interference from the executive—and not the legislature—I do not oppose drawing from the historical context a broader principle that would prohibit interference from the legislature as well.[15] But that principle does not automatically carry with it the more expansive notion still that remedy guarantees also limit legislative authority to determine the nature of injuries that must be remedied by due course of law. That is a qualitatively different proposition.
Legislative determination of the nature of injuries that may be remedied and the nature of those remedies in no way interferes with the court’s constitutional obligation to see that justice is administered openly, speedily, affording every person remedy by due course of law. It is for the legislature to determine what the due course of law entails. And, under the remedy guarantee, it is for the courts to see to it that all persons are given remedy by it.
The potential fly in the ointment, so to speak, is the existence of a number of early to mid-nineteenth-century *281 decisions from other states that hold that state constitutional remedy guarantees also prohibit legislation that retroactively alters vested rights. But, as I have explained, a more careful examination of the underlying rationale for those decisions makes clear that they actually line up quite nicely with what the text and the historical underpinnings of the remedy guarantee so strongly suggest. Those decisions hold that retroactive alteration of vested rights violates state remedy guarantees because such legislation was regarded as a violation of the judicial function, viz., to apply the law that applied at the time rights vested.
I hasten to add that I do not suggest that our reading of the remedy guarantee should be constrained by nineteenth-century conceptions of vested rights and retro-activity. As I have said—and as our cases hold—we attempt to draw from historical context more general principles that may be applied to modern circumstances. In this case, the broader principle that I draw from the early to mid-nineteenth-century cases is simply that state constitutional remedy guarantees constrain not only executive interference with judicial independence and access to the courts, but legislative interference as well. I should add that reading the remedy clause to forbid only interference with judicial independence and access to courts—and not as a limitation on the authority of legislatures to define injuries and remedies—is not an unusual or retrograde interpretation. It is, in fact, what most other state courts make of their constitutional remedy guarantees.[16]
*282 I am aware of the fact that adopting that view of the remedy guarantee of Article I, section 10, would require overruling a lot of case law, and I do not take that fact lightly. But this court’s case law is so hopelessly conflicting that I do not understand how we can move forward— particularly if we hope to provide the bench and bar with anything close to helpful doctrine—without overruling something. As I mentioned at the outset of this opinion, stubborn adherence to case law that is in conflict and demonstrably in error is not costless. It produces its own threats to stability and predictability—the very virtues that stare decisis is supposed to promote.
III. SOME PRACTICAL CONCERNS
That last point concerning the costs of adhering to erroneous precedent leads me to conclude with some observations about the practical consequences of the majority’s decision. To begin with, it is not clear what remains of our prior case law. The majority overrules Smothers, and Smothers alone. But it strikes me that the decision to do that may have ripple effects back through a number of earlier decisions. Smothers itself overruled a number of prior cases, such as Perozzi and Noonan. I presume those have once again been resuscitated. But Smothers also relied on other cases for its holding that the remedy clause applies only to common-law actions existing at the time of the adoption of our constitution. Stewart, for example, concluded that “[t]he purpose of this provision is to save from legislative abolishment those jural rights which had become well established prior to the enactment of our Constitution.” 127 Or at 591. That is precisely the proposition of law that the majority in this case abjures in overruling Smothers.
Aside from that, it is also unclear to me what standard applies to remedy clause challenges going forward. The majority offers three “categories” of legislation with three *283 different tests concerning the limits of legislative authority. First, there are statutes that leave in place a duty but deny a remedy for breach of that duty. 359 Or at 219. Second, there are statutes that adjust an individual’s rights and remedies as part of a “larger statutory scheme” that extends benefits to some while limiting benefits to others. Id. Third, there are statutes that wholly eliminate claims and underlying duties. According to the majority, whether such statutes are constitutionally permissible depends on whether the action that was modified “continues to protect core interests” or whether, in light of changed circumstances, those interests “no longer require the protection formerly afforded them.” Id.
I don’t begrudge the majority its attempt to reconcile our existing cases by coming up with new tests for evaluating remedy clause challenges. If we are not going to overrule any of them, those cases fairly cry out for such an effort. This, however, is but the latest in a series of attempts by this court to accomplish that very feat. Each of those prior attempts has failed to offer any real doctrinal clarity, by this court’s own reckoning. And I fear that the majority’s effort in this case will fare no better.
The majority’s first category seems unobjectionable to me. It requires that statutes altering remedies for existing duties not be “insubstantial.” As we explained in Howell, that’s what the prior case law says, even if it leaves something to be desired in the way of clarity. 353 Or at 388.
The second category, likewise, appears supported by case law, although the nature of the quid pro quo test itself has proven somewhat elusive. Compare Howell, 353 Or at 376 (applying Hale’s “balance” analysis), with 353 Or at 393-94 (DeMuniz, J. pro tempore, dissenting) (contesting majority’s reading oí Hale).
It is the majority’s third category that gives me pause. To begin with, I do not know where it comes from. The majority asserts that, in assessing whether the legislature constitutionally abolished an underlying duty or a claim, we must take into account whether “core interests” remain protected. I have searched in vain for a single decision of this *284 court that even uses the phrase, much less identifies it as a relevant consideration in remedy clause analysis.
It appears that the majority is assuming that, while the legislature may have the authority to alter the common law, there remains something of an irreducible quantum of interests formerly protected by the common law that must remain protected. I am at a loss to explain the source of such interests. Whether they are rooted in a notion of natural law (which, it seems to me, would be awfully close to the very “absolute” rights analysis that the majority says it rejects) or something similar, the majority does not explain.
Smothers, for all its faults, at least supplied a point of reference in defining the constitutionally irreducible minimum of rights in terms of common-law claims that existed at the time of the state’s founding. 332 Or at 124. The majority, however, does away with that, leaving in its place nothing but a bare reference to “core interests.”
It could be argued that the text of Article I, section 10, supplies the “core interests” in declaring that everyone must have remedy by due course of law for injury to “person, property or reputation.” Nothing in the constitution, however, bars the legislature from redefining the nature of the “person” or the “property” or the “reputation” interests that are subject to protection.
Consider, for example, the common-law claims of alienation of affection and criminal conversation.[17] Historically, the claims were rooted in the Anglo-Saxon idea *285 that married women were the property of their husbands. See generally Jill Jones, Fanning an Old Flame: Alienation of Affections and Criminal Conversation Revisited, 26 Pepperdine L Rev 61, 75 (1998) (“ [B] oth alienation of affection and criminal conversation were historically grounded in the property notions that wives were chattel.”).[18] In the twentieth century, legislatures across the country— including Oregon’s, see ORS 31.980 (“There shall be no civil action for alienation of affection.”); ORS 31.982 (“There shall be no civil cause of action for criminal conversation”)— abolished the claims entirely. See generally Jamie Heard, The National Trend of Abolishing Actions for Alienation of a Spouse’s Affection and Mississippi’s Refusal to Follow Suit, 28 Miss C L Rev 313 (2009). State legislatures, in other words, redefined the nature of “property” interests that, in their judgment, deserve protection through civil actions for damages.[19]
No one doubts the constitutionality of that legislation. This court said as much in Noonan. 161 Or at 249 (noting with approval that courts in other states had upheld the constitutionality of legislative abrogation of alienation of affection and like actions). The point is that the constitution, merely by declaring that everyone must have remedy by due course of law for injuries to “person, property or reputation,” doesn’t tell us what those terms irreducibly mean. To the contrary, at least to some extent, the legislature remains free to define them.
The majority appears to acknowledge the point in suggesting that, even if certain interests otherwise might be regarded as “core,” the legislature may constitutionally *286 reevaluate them as having become, in effect, vestigial. But, once again, where the majority finds support for its analysis is unstated. It supplies no references in this court’s case law, and I am aware of none. Of particular concern to me is the fact that the majority doesn’t explain by what standard the bench and bar—and the legislature, it should not be forgotten—is to evaluate when an interest may constitutionally be reconsidered and moved from being “core” to being of a lesser nature that no longer requires constitutional protection. The majority hints that “the reasons for the legislature’s actions can matter,” but it offers no clues about what sorts of reasons might matter. The hint sounds suspiciously like substantive due process analysis, under which legislation altering existing rights may be justified—depending on the nature of the rights involved—by a reasonable connection with legitimate state interests. See, e.g., Washington v. Glucksberg, 521 US 702, 720-21, 117 S Ct 2258, 138 L Ed 2d 772 (1997) (setting out federal substantive due process analysis); MacPherson, 340 Or at 140 (applying same analysis). But, at this point, we can merely guess.
In my view, given the woeful state of the current remedy clause case law, this court should not be satisfied with tinkering with only one aspect of that law. By overruling only the portion of Smothers that limits the remedy to claims existing in 1857, I fear the majority only makes matters worse. In effect, it returns us to the sort of case-by-case incrementalism that got us in trouble in the first place.
This court’s existing cases construing the remedy provision of Article I, section 10, cannot be squared with the text of the clause or its historical context. I would overrule those cases and hold that the provision protects against executive and legislative interference with judicial independence and access to the courts, but does not impose a limitation on the otherwise plenary authority of the legislature to determine rights and remedies. It is for that reason that the trial court erred in concluding that the cap on damages at issue in this case violated Article I, section 10. And it is for that reason that I concur in the result in this case as to the disposition of the parties’ remedy clause claim.

 See also Storm v. McClung, 334 Or 210, 221, 47 P3d 476 (2002) (citing Smothers for observation that “this court previously had failed definitively to establish and consistently apply any one theory regarding the protections afforded by the remedies guarantee”); Greist v. Phillips, 322 Or 281, 304, 906 P2d 789 (1995) (Unis, J., concurring in part) (complaining about the court’s “inconsistent” approach to the remedy guarantee); Junping Han, The Constitutionality of Oregon’s Split-Recovery Punitive Damages Statute, 38 Willamette L Rev 477, 529-30 (2002) (noting shifts in Oregon Supreme Court analysis of remedy guarantee); Lisa S. Guterson, The Remedy Clause Analysis of Neher v. Chartier, 74 Or L Rev 379, 382 (1995) (noting back-and-forth nature of Oregon remedy analysis); Jonathan M. Hoffman, By the Course of the Law: The Origins of the Open Courts Clause of State Constitutions, 74 Or L Rev 1279, 1282 (1995) (noting lack of principled analysis of Article I, section 10).

 Interestingly, in dictum, the Chief Justice added that, had Templeton’s claim vested before the time the legislature acted, the result might have been different. Templeton, 22 Or at 317. As I explain below, that comment comports with the common early-nineteenth-century view that remedy guarantees, at best, prohibited the legislature from retroactively altering vested rights, but do not *258 constrain legislatures from prospectively redefining the nature of injuries that the law will protect or the nature of those protections.

 Lawson was especially perplexing in that the court appeared to transform the principle in Smothers that certain “absolute” rights were protected by Article I, section 10, into one that the remedy clause applies only when a plaintiff *260 would have had an absolute right to recover—that is, free from any possible defenses. Lawson, 339 Or at 264-65 (because the plaintiff’s personal injury claim would have been subject to defenses that would have barred recovery, there was “no absolute common-law right” that the remedy guarantee protected).

 As David Schuman suggests, constitutional interpretation must demonstrate “fidelity” to the constitution. David Schuman, The Right to a Remedy, 65 Temple L Rev 1197, 1219 (1992):
“The requirement of ‘fidelity to the text,’ in this context, is the relatively obvious and uncontroversial requirement that a court’s explanation of the meaning of a given constitutional provision should demonstrate some logical connection to the words it purports to interpret, including their source, history, and position in the overall document.”

Id.

 It does not say, as is sometimes suggested, that everyone is entitled to “a remedy” for every personal injury. See, e.g., Howell, 353 Or at 389 n 1 (DeMuniz, J. pro tempore, dissenting) (“The Remedy Clause affords plaintiff, and every person in this state, the right to a remedy by due course of law for personal injuries.”). Nor does Article I, section 10, include the qualifier that remedies must be “adequate,” as some other state constitutions do. See, e.g., La Const, Art I, § 22 (“All courts shall be open, and every person shall have an adequate remedy by due process of law[.]”).

 Magna Carta had been “reissued” several times between 1215, when it was originally sealed, and 1225. In the process, several of the original provisions got renumbered. Among them were the original Chapters 39 and 40, which were renumbered as Chapter 29 of the 1225 version. Coke wrote about that later version of the document, not the original. See generally Faith Thompson, Magna Carta: Its Role in the Making of the English Constitution 1300-1629 at 5 (1948) (describing Coke’s reliance on 1225 version of Magna Carta).

 Leading historian R. H. Hemholz remarked, “[t]he student who picks Bonham’s Case as a topic had better take a deep breath first.” R. H. Hemholz, Bonham’s Case, Judicial Review, and the Law of Nature, 1 J Legal Analysis 325, 325 (2009). The dispute centers on whether Coke’s opinion announced a principle of statutory construction, see, e.g., Samuel E. Thorne, Dr. Bonham’s Case, 54 LQ Rev 54 (1938), or a principle that judges have authority to invalidate parliamentary enactments that violate higher law, Raoul Berger, Doctor Bonham’s Case: Statutory Construction or Constitutional Theory?, 117 U Pa L Rev 521 (1969), or something in between, R. A. McKay, Coke: Parliamentary Sovereignty or the Supremacy of the Law?, 22 Mich L Rev 215 (1924). A number of scholars have noted that Coke and Blackstone actually made inconsistent statements about Dr. Bonham’s Case, leading some to say that they were simply mistaken about the decision, T. F. T. Plucknett, Bonham’s Case and Judicial Review, 40 Harv L Rev 30, 69 (1926), or (my favorite) that their views on the case depended on their “mood,” W. W. Buckland, Some Reflections on Jurisprudence 38 (1945). In spite of the longstanding debate, “[t]he weight of modern scholarship” supports the more limited view that Dr. Bonham’s Case merely reflects a rule of construction, not a broader principle concerning judicial authority to invalidate statutes. Nathan S. Chapman & Michael W. McConnell, Due Process as Separation of Powers, 121 Yale LJ 1672, 1690 (2012). In addition, although it is often stated that, even if Coke originally intended that his decision stand for the narrower proposition, the founders of the American constitution read it more broadly, that view, too, is viewed more skeptically by modern scholars. See, e.g., Larry D. Kramer, The People Themselves: Popular Constitutionalism and Judicial Review 19-22 (2004); Chapman & McConnell, Due Process as Separation of Powers, 121 Yale LJ at 1691.

 See generally Gordon S. Wood, The Creation of the American Republic 1776-1787 at 260 (3d ed 2011) (“Parliament, as *** Blackstone had made evident, was no longer simply the highest court among others in the land, but had in truth become the sovereign lawmaker of the realm, whose power, however arbitrary and unreasonable, was uncontrollable.”); Theodore F. T. Plucknett, A Concise History of the Common Law 337 (1956) (by the eighteenth century, “there were no legal limitations upon the powers of Parliament”); Bernadette Meyler, Towards a Common Law Originalism, 59 Stan L Rev 551, 562 (2006) (Blackstone “wrote at a point when the common law itself was on the wane, and parliamentary supremacy had been definitely established”); Suja A. Thomas, A Limitation on Congress: “In Suits at Common Law,” 71 Ohio St LJ 1071, 1102-03 (2010) (in the eighteenth century, “there was the general belief that Parliament could take any actions, including the alteration of the common law”).

 As one scholar has summarized, Blackstone was “a champion of parliamentary supremacy” and did not share the view often attributed to Coke’s dictum in Dr. Bonham’s Case that judges could disregard legislation that they regarded as inconsistent with reason or the laws of nature. Albert W. Alschuler, Rediscovering Blackstone, 145 U Pa L Rev 1, 19 n 106 (1996). “If Parliament were to defy the law of nature (a prospect that Blackstone thought almost inconceivable), the only remedy would lie in the streets rather than in the courts.” Id.; see also Wood, The Creation of the American Republic 1776-1787 at 260 (“[T]o most Englishmen * * * moral and natural law limitations on the Parliament were strictly theoretical, without legal meaning, and relevant only in so far as they impinged on the minds of the lawmakers.”).

 Blackstone’s views of parliamentary supremacy were not wholeheartedly embraced in the American colonies. James Wilson, for example, rejected Blackstone’s views as “dangerous and unsound,” containing the “seeds of despotism.” 1 The Works of James Wilson 168-93 (Robert G. McCloskey ed., 1967); see generally Arthur E. Wilmarth, Jr., Elusive Foundation: John Marshall, James Wilson, and the Problem of Reconciling Popular Sovereignty and Natural Law Jurisprudence in the New Federal Republic, 72 Geo Wash L Rev 113, 167 (2003) (“Wilson, however, rejected Blackstone’s claim of Parliamentary supremacy.”). But that only confirms the point that it is a mistake to suggest that Blackstone was a source for the idea that courts could check abuses of legislative authority.

 See also Joseph Story, 3 Commentaries on the Constitution of the United States § 1392, 266-67 (1833) (legislation altering vested rights amounted to legislative exercise of “judicial functions”); Theodore Sedgwick, A Treatise on the Rules Which Govern the Interpretation and Application of Statutory and Constitutional Law 676-77 (1857) (retroactive legislation altering vested rights is unconstitutional because “legislatures by our fundamental law [are] prohibited from doing any judicial acts”); Thomas M. Cooley, A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union 362 (1868) (Whether a vested right “springs from contract or from the principles of common law, it is not competent for the legislature to take it away * * * unless steps are taken to have the forfeiture declared in due judicial proceedings. Forfeitures of rights or property cannot be adjudged by legislative act.”).
There is a wealth of modern scholarship on pre-Civil War judicial antipathy to retroactive legislation regarding vested rights as the theoretical underpinning for a range of constitutional doctrines, including ex post facto, impairment of contract, remedy by due course of law or law of the land, and—especially—due process guarantees. See, e.g., Chapman & McConnell, Due Process as Separation of Powers, 121 Yale L J at 1727 (“Courts used separation-of-powers logic to invalidate legislative acts under a variety of constitutional provisions.”); Ann Woolhandler, Public Rights, Private Rights, and Statutory Retroactivity, 94 Geo LJ 1015, 1025 (2006) (retroactive elimination of vested rights “were often said either to deprive people of property without ‘due process of law’ or to cross the line between ‘legislative’ and ‘judicial’ power); Nathan N. Frost, Rachel Beth Klein-Levine & Thomas B. McAfee, Courts Over Constitutions Revisited: Unwritten Constitutionalism in the States, 2004 Utah L Rev 333, 382 (2004) (“The doctrine of vested rights grew out of a recognition that when legislatures act like courts, the potential for abuse grows not only by the omission of some particular procedure in question—such as trial by jury—but also by the departure from separation of powers.”); John Harrison, Substantive Due Process and the Constitutional Text, 83 Va L Rev 493, 511 n 46 (1997) (explaining that early vested-rights case law was understood “primarily in terms of the constitutional structure of separated powers” in that legislative abrogation of vested rights was “seen as an attempt to exercise the judicial power”); James L. Kainen, The Historical Framework for Reviving Constitutional Protection for Property and Contract Rights, 79 Cornell L Rev 87, 108 n 82 (1993) (citing Sedgwick for pre-Civil War view that “the protection of vested rights defines the proper role of courts in securing individual rights against legislative interference when there is no express federal or state constitutional shield”); Wallace Mendelson, A Missing Link in the Evolution of Due Process, 10 Vand L Rev 125, 136 (1956) (noting the significance of separation of powers doctrine as the rationale for voiding retroactive legislation altering vested rights).

 So deep was nineteenth-century antipathy to retroactivity that, even when vested rights were not involved, the prevailing doctrine worked hard to avoid giving legislation anything but prospective effect. As a later nineteenth-century treatise explained, citing pre-Civil War case law, “One of the cardinal rules by which courts are governed in interpreting statutes is, that they must be construed as prospective in every instance,” except when a contrary intent “is expressed in clear and unambiguous terms.” William P. Wade, A Treatise on the Operation and Construction of Retroactive Laws 39-40 (1880). “Every reasonable doubt,” the treatise added, “is resolved against, rather than in favor of, the retroactive operation of the statute.” Id. at 41 (emphasis in original); see also Henry Campbell Black, An Essay on Constitutional Prohibitions Against Legislation Impairing the Obligation of Contracts and Against Retroactive and Ex Post Facto Laws 230 (1887) (“It is an inflexible rule that a statute will be construed as prospective and operating in futuro only, unless the intention of the legislature to give it retroactive effect is expressed in language too clear and explicit to admit of reasonable doubt”) (Citing early nineteenth-century decisions.).

 Thus, for example, contract disputes were governed “according to the course of justice as it existed at the time the contract was made.” Cooley, A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union 308 (2d ed 1871); see also Francis Wharton, Retrospective Legislation and Grangerism, 3 Int’l Rev 50, 60 (1876) (“For it is a fundamental principle of jurisprudence that a contract is to be construed according to the law which was in force at the time of its execution. *** The right to insist on the perfection of these rules, no matter what may be the course of subsequent legislation, is vested in both parties at the time of the execution of the contract.”).

 I suppose that an alternative way to treat the anti-retroactivity cases would be simply to say that, in addition to guaranteeing judicial independence and access to courts, the remedy provision of Article I, section 10, prohibits certain forms of retroactive legislation. Some courts, in fact, have taken that view. See, e.g., Friends of Pennsylvania Leadership Charter School v. Chester County Board of Assessment Appeals, 61 A3d 354, 360 (Pa 2013) (“ [i] t is well-settled that applying legislation retroactively to extinguish an accrued vested right is prohibited” by the state constitutional remedy guarantee); State ex rel. Howell v. Wildes, 34 Nev 94, 116 P 595, 600 (1911) (retroactive alteration of vested rights is “an attempted infringement upon the functions of the judicial branch of government”). I do not. It strikes me that it reflects the sort of wooden originalism about which I have complained, in applying nineteenth-century case law without attempting to draw from it an underlying principle that may be applied to modern circumstances.

 There is ample precedent for that much. Article I, section 9, for example, is addressed to the legislature (“No law shall. . .”), and such search and seizure provisions historically were understood not to apply directly to executive branch law enforcement authorities. See, e.g., Thomas Y. Davies, Correcting Search-and-Seizure History: Now Forgotten Common-Law Warrantless Arrest Standards and the Original Understanding of “Due Process of Law," 77 Miss LJ 89, 90 (2007) (“The current notion that constitutional standards, such as search-and-seizure standards, address the conduct of ordinary [police] officers dates back only to the beginning of the twentieth century. Under framing-era doctrine, legislation and court orders were governmental in character, so it was possible to conceive of an ‘unconstitutional’ statute or an ‘unconstitutional’ general warrant issued by a court. However, there was no conception that an ordinary officer could act ‘unconstitutionally.’”). Nevertheless, this court—like most courts'—has construed the constitutional provision to state a broader principle that applies to all branches of government. See generally State v. McDaniel, 115 Or 187, 209, 231 P 965 (1925).

 As the Montana Supreme Court explained in Stewart v. Standard Pub. Co., 102 Mont 43, 55 P2d 694, 696 (1936):
“A reading of the [state remedy guarantee] discloses that it is addressed exclusively to the courts. The courts are its sole subject matter, and it relates directly to the duties of the judicial department of the government. It means no more nor less than that, under the provisions of the Constitution and laws constituting them, the courts must be accessible to all persons alike, without discrimination, at the time or times, and the place or places, appointed for their sitting, and afford a speedy remedy for every wrong recognized by law as being remediable in court.”
See also, e.g., O’Quinn v. Walt Disney Productions, Inc., 177 Colo 190, 195, 493 P2d 344, 346 (1972) (remedy clause “simply provides that if a right does accrue under the law, the courts will be available to effectuate such right”); Hawley v. Green, 117 Idaho 498, 500-01, 788 P2d 1321, 1323-24 (1990) (state remedy guarantee “merely admonishes the Idaho courts to dispense justice and to secure citizens the rights and remedies afforded by the legislature or by the common law”); *282 MJ Farms, Ltd v. Exxon Mobil Corp., 998 So 2d 16, 37 (La 2008) (state remedy clause “operates only to provide remedies which are fashioned by the legislature”); Lamb v. Wedgewood South Corp., 308 NC 419, 444, 302 SE2d 868, 882 (1983) (“[T]he remedy constitutionally guaranteed must be one that is legally cognizable. The legislature has the power to define the circumstances under which a remedy is legally cognizable and those under which it is not.”).

 The tort of alienation of affection finds its genesis in the early English common-law action of enticement, that is, inducing a woman to leave her husband through fraud, violence, or some other wrongful conduct. See generally W. Page Keeton et al, Prosser and Keeton on the Law of Torts § 124 (5th ed 1984). The tort of criminal conversation similarly is rooted in the English claim of seduction, which required that the wife have engaged in adultery, without regard to whether she actually left her husband. Id. The torts initially were recognized in this country in 1866, Heermance v. James, 47 Barb 120, 127 (NY Gen Term 1866), and ultimately were acknowledged by every state save Louisiana (which viewed marriage as a civil contract). See generally Michele Crissman, Alienation of Affections: An Ancient Tort—But Still Alive in South Dakota, 48 SD L Rev 518, 520 (2003). Oregon came to recognize both torts. See, e.g., Saxton v. Barber, 71 Or 230, 139 P 334 (1914) (alienation of affection); Pitman v. Bump, 5 Or 17 (1873) (criminal conversation).

 Blackstone, for instance, noted that a husband has a property interest in the “company, care, or assistance” of his wife. William Blackstone, 3 Commentaries on the Laws of England 142-43 (1st ed 1768); see also Hipp v. DuPont, 182 NC 9, 108 SE 318, 319 (1921) (“[T]he husband could maintain an action for the injuries sustained by his wife * * * by reason of the fact that the wife was his chattel.”).

 The “heartbalm” torts of alienation of affection and criminal conversation, by the way, are not the only examples. Quite a number of torts have fallen by the wayside over the last century, including a wife’s claim for damages arising out of a husband’s alcoholism, the claim of mishandling of a corpse, the tort of insult (separate from defamation), actions against “common scolds,” and certain aspects of nuisance law, among others. See generally Kyle Graham, Why Torts Die, 35 Fla St U L Rev 359, 364-73 (2008).